Margaret POUNDERS *v.* TRINITY COURT NURSING
HOME, INC. et al

78-198                                    576 S.W. 2d 934

Opinion delivered February 5, 1979
(In Banc)

*Laster & Lane, Ltd.,* for appellant.

*Gannaway, Darrow & Hanshaw,* for appellees.

GEORGE ROSE SMITH, Justice. The appellant, Margaret Pounders, aged 75, a widow, brought suit for false imprisonment against the two appellees, Trinity Court Nursing Home and Gloria Gaines, who is a niece of Mrs. Pounders's late husband. At the close of a jury trial the judge directed a verdict in favor of both defendants. The only question is whether there is any substantial evidence presenting a prima facie case of false imprisonment. We find no such evidence in the record.

We state the facts in the light most favorable to Mrs. Pounders. For some time she had lived with Mr. and Mrs. Gaines, who, in Mrs. Pounders's words, were wonderful to her. Mr. Gaines, however, became dissatisfied with the arrangement and directed that Mrs. Pounders be placed in a nursing home. Mrs. Pounders did not own a place of her own.

On July 14, 1976, Mrs. Gaines took Mrs. Pounders to Trinity Court, a nursing home occupying a two-story building in Little Rock. Mrs. Pounders, understandably, did not want to enter a nursing home, but she testified that she went without protest. There is no imprisonment when one agrees to surrender her freedom of motion. *Faulkinbury* v. *U.S. Fire Ins. Co.*, 247 Ark. 70, 444 S.W. 2d 254 (1969). Mrs. Gaines's commitment of her aunt to the nursing home obviously did not amount to false imprisonment, because no force or threats were used, and there was actually consent.

Mrs. Pounders remained in the nursing home for two months. She testified that she was not allowed to have any visitors (except, apparently, Mrs. Gaines), that she was not allowed to use the telephone, and that she was not allowed to write to anyone. Her room was on the second floor. There was a nearby stairway by which she could have left the building any time she wanted to. Her reason for not leaving was that the nursing home had her shoes, and she did not want to go out in bedroom slippers. She also said that one of the aides (unidentified and not shown to have had any authority to speak for the nursing home) told her that if she tried to run away, "they'd get you before you'd get anywhere and they would just bring you back." Mrs. Pounders admits that Mrs. Gaines visited her once or twice a week. She does not say that she ever spoke to Mrs. Gaines about the possibility of going somewhere else.

Again, there was obviously no false imprisonment during Mrs. Pounders's stay at Trinity Court. To make a defendant liable for false imprisonment, the plaintiff's confinement within boundaries fixed by the defendant must be *complete.* Restatement of the Law, Torts (2d), § 36 (1965). Here there is no evidence whatever either of physical force or of any threat of physical force. To the contrary, Mrs. Pounders could have left the nursing home at will, but she simply had nowhere to go and chose to stay.

Finally, there remain the events that led to her departure. Mrs. Pounders sent word to Laura Fulmer, the wife of a nephew of Mrs. Pounders's husband, that she wanted to leave the nursing home. Mrs. Fulmer testified that she telephoned Trinity Court to ask about visiting hours and was told that Mrs. Pounders was not allowed to have any visitors. On the afternoon of July 13 Mrs. Fulmer went to the nursing home and had no difficulty in going up to the second floor and visiting with Mrs. Pounders in her room. She then went downstairs to the office and talked to Mrs. Brummett, the wife of the manager. When Mrs. Fulmer explained that she was Mrs. Pounders's niece by marriage and wanted Mrs. Pounders to come live with her, Mrs. Brummett said that no one could get her out but Mrs. Gaines. No effort was ever made to get Mrs. Gaines's consent to the release, and there is no indication that she would not have agreed. Mrs. Brummett's statement certainly did not amount to the physical restraint that constitutes false imprisonment.

Mrs. Fulmer went directly from Trinity Court to a lawyer, J. H. Berry. Berry testified that, "as I told Mrs. Fulmer, I wanted to get some idea whether I felt that [Mrs. Pounders] was really able to make her own decision. And also, I wanted to see, to ascertain myself, whether she wanted to go or stay." Berry went to the nursing home and, with no difficulty, went upstairs to Mrs. Pounders's room and talked with her for some time. He was satisfied that she was in full possession of her faculties and wanted to leave.

Berry then went downstairs to see the manager, Mr. Brummett. Berry explained in his testimony just what happened:

A. . . . Mr. Brummett came in very shortly and told me that it was their custom that the people in the nursing home be released only to those who brought them in, and I told him that, in my opinion, since she wanted to leave, that they had no right to hold her. I also told him that if she wasn't released, well, we would have no alternative but to apply for a writ of habeas corpus.

Q. The purpose of which is what?

A. The purpose of which is to determine whether there is a legal basis for holding someone. And which, if it had been successful, would have brought about her release.

Q. What was Mr. Brummett's response to this statement?

A. Well, of course, Mr. Brummett was very courteous throughout. He said, Well I will talk with — and he—I can't remember who specifically he said he would talk with, but he said he would talk with one of the nieces of Mrs. Pounders, who had brought her there and see if it would be all right. And he tried to call. I can't remember whether he called one or made one or two attempts to call one or two different people. But, when he couldn't locate them, he said, "Well, I'll tell you what I'm going to do, I'm just going to go ahead and release her." And he did immediately. He said she could go any time someone came to pick her up. Of course, I myself wanted someone to pick her up, you know, some member of the family. And Mrs. Fulmer had always said to let her know and she would come and get her. So, I notified Mrs. Fulmer and assume she was immediately released to Mrs. Fulmer.

Mrs. Pounders in fact left with Mrs. Fulmer and was living with the Fulmers at the time of the trial.

Again, it is obvious that there was no false imprisonment in its proper sense of compulsory physical confinement. The nursing home's rule that a patient be released to the person

who arranged for her admission certainly does not amount to false imprisonment. That Berry saw fit to suggest the possibility of an application for a writ of habeas corpus did not somehow have the effect of physically imprisoning Mrs. Pounders, who was upstairs in her room and could have walked out by herself if she had chosen to do so. We agree with the trial judge's conclusion that there was no substantial evidence of false imprisonment either by Trinity Court or by Mrs. Gaines.

Affirmed.

BYRD and PURTLE, JJ., dissent.

JOHN I. PURTLE, Justice, dissenting. This is a very close question and no doubt of little consequence to anyone other than Margaret Pounders. She is a 75 year old disabled widow who was relegated to the confines of a nursing home against her wishes. As it is with a large number of our senior citizens, she dreaded the thought of being placed in a nursing home. Appellant had been living with Gloria Gaines and her husband until one day Harold Gaines told Gloria Gaines when he returned from work he wanted her to have appellant out of the house. Appellee Gloria Gaines found a room at Trinity Court Nursing Home, Inc., the other appellee in this action, and made arrangements to move appellant to the nursing home that same day, July 14, 1976. Appellee Gaines signed appellant Pounders into Trinity, where she remained until September 14, 1976.

There is much testimony concerning the shabby treatment appellant received and even more evidence on the excellent care and treatment she received during her two-month stay in the facility. Which version is true, if either, is beside the question for the purpose of this opinion. In order to reach the point of whether the appellant was falsely imprisoned, we must necessarily look at some of the facts. At some point in time, Laura Fulmer, a relative by marriage, found that appellant was staying at Trinity and proceeded to try to get the appellee (Trinity) to release Mrs. Pounders to her care as she intended to take her into her home to live. Trinity rejected the request of Mrs. Fulmer and informed her it was the

policy of Trinity to release residents of the home only to the party who entered them into the facility. Mrs. Fulmer finally consulted attorney J. Harrod Berry about getting Mrs. Pounders released to Mrs. Fulmer. The following day, Mr. Berry called Mr. Brummett at Trinity and told him he felt Mrs. Pounders had a right to leave the home if she was able to leave, especially if she appeared competent. He finally stated that, in his opinion, appellant was entitled to be released, period. Brummett again explained to the lawyer that it was the practice of the facility not to release a resident to anyone without the approval of the party who brought them to the nursing home. Mr. Berry then talked with appellant in person in the nursing home and understood clearly she wanted to leave the place. Mr. Berry felt she was in full possession of her faculties. Again he went to see Mr. Brummett, who still refused to release Mrs. Pounders without the approval of Mrs. Gaines. After the attorney threatened to file a petition for a writ of habeas corpus, Trinity decided to release appellant. She was released to Mrs. Fulmer on the same date, after Mrs. Gaines came and approved it. There is little, if any, dispute on the above-stated facts.

It should be noted that the appellant had not been adjudicated as an incompetent, nor had a guardian been appointed for her. In other words, all the activities involved in this matter were outside the judicial process. Those parties were as encumbered or unencumbered from the law as the other free citizens of the state.

Ark. Stat. Ann. § 41-1704(1)(Repl. 1977) states:

"(1) A person commits the offense of false imprisonment in the second degree if, without consent, and without lawful authority, he knowingly restrains another person so as to interfere substantially with his liberty."

This, of course, was not a criminal proceeding. However, it is an accurate description of what constitutes false imprisonment. In false imprisonment cases the primary right involved is the liberty of the citizen, which is guaranteed by the state and federal Constitution. Except for prohibition by law,

a person is free to come and go, or stay, if he/she is not violating the rights of others. Mrs. Pounders was entitled to be free from restraint and to leave the nursing home if she chose to do so. There was no legal right for either of the appellees to restrain the appellant against her will. Imprisonment has been defined in *Watkins* v. *Oaklawn Jockey Club*, 86 Fed. Supp. 1006, and quoted with approval in *Pettyjohn* v. *Smith, et al*, 255 Ark. 780, 502 S.W. 2d 618 (1973) as:

> "Every confinement of the person is an imprisonment, and any express or implied threat or force whereby one is deprived of his liberty or compelled to go where he does not wish to go is an imprisonment."

In other jurisdictions, *Griffin* v. *Clark*, 42 P. 2d 297, the Idaho Supreme Court stated:

> "In false imprisonment or unlawful restraint, the primary right involved is the liberty of the citizen; the right of freedom of locomotion; the right to come and go or stay, when or where one may choose . . . There need be no actual force or threats, nor injury done to the individual's person, character, or reputation. Neither is it necessary that the wrongful act be committed with malice or ill will, or even with the slightest wrongful intention. . ."

If appellant was prevented against her will from going from the Trinity Court Nursing Home, Inc. at any time she so desired, she was falsely imprisoned. There was ample evidence in the record from which the jury could have found she was prevented from leaving the home at the time she wanted to leave. It may have been for only a few hours duration but, is, nevertheless, detention against her will, if her testimony is believed.

The court in this case gave the following as the definition of what constitutes false imprisonment:

> "False imprisonment means to be in custody against your will, to have restraints, such as chains, handcuffs, locked doors, barriers or keeping someone behind walls

or within the premises, under a hidden identity or things of that nature. And in this case, there is absolutely no evidence of forced coercion, threats of any kind made to this lady to keep her there."

The trial court limited the definition of false imprisonment to the extent that, if correct, it was proper to dismiss the complaint as to both appellees. However, the definition of false imprisonment is not so limited as stated, and the evidence as to Trinity was sufficient to go to the jury. The evidence as to Gloria Gaines was insufficient to go to the jury even under the more liberal interpretation and the trial court was correct in directing a verdict in favor of appellee Gloria Gaines.

On numerous occasions this Court has decided the question as to when a directed verdict is proper. These cases all hold to the effect that, when considering whether to direct a verdict for the defendant, the evidence must be considered in the light most favorable to the plaintiff and if there is any substantial evidence on which the jury could base a finding of negligence on the part of the defendant, the verdict should not be directed. *Garrett* v. *A.P. & L.,* 218 Ark. 575, 237 S.W. 2d 895 (1951). A directed verdict should be granted for the same reasons a summary judgment should be granted. A summary judgment should not be granted if it is inconsistent with any reasonable hypothesis which might reasonably be drawn from the proper evidence before the court. *Betnam* v. *Ross,* 259 Ark. 820, 536 S.W. 2d 719 (1976).

For these reasons, the case should be affirmed as to Gloria Gaines and reversed and remanded as to Trinity Court Nursing Home, Inc.

BYRD, J., joins in the dissent.